# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| WIKA INSTRUMENT, LP, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | 1:13-cv-00043-CAP |
| | ) | |
| ASHCROFT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT ASHCROFT, INC.'S
## MOTION FOR JUDGMENT AS A MATTER OF LAW

HOLLAND & KNIGHT LLP

*/s/ Caroline Johnson Tanner*

Caroline Johnson Tanner
Georgia Bar No. 392580
Gregory J. Digel
Georgia Bar No. 221750
Keisha O. Coleman
Georgia Bar No. 844720
1180 West Peachtree St, Ste 1800
Atlanta, Georgia 30309
(404) 817-8500
caroline.tanner@hklaw.com
greg.digel@hklaw.com
keisha.coleman@hklaw.com

Brian G. Leary (*pro hac vice*)
Massachusetts Bar No. 548386
Benjamin M. McGovern (*pro hac vice*)
Massachusetts Bar No. 661611
10 St. James Avenue
Boston, Massachusetts 02116
(617) 523-2700
brian.leary@hklaw.com
benjamin.mcgovern@hklaw.com

# TABLE OF CONTENTS

I.    LEGAL STANDARD ......................................................................1

II.   LANHAM ACT CLAIMS (COUNT I)........................................1

   A.    ASHCROFT'S PRODUCT INFORMATION PAGE................1

     1.    Insufficient Evidence of Literal Falsity .........................1

     2.    Insufficient Evidence of Deception, Material Effect on Purchasing Decisions, or Damage ....................................11

       a. Insufficient Evidence of Lost Sale to Chevron Indonesia...................12

       b. Insufficient Evidence of Lost Sale to Philadelphia Energy Solutions ..............................................................................14

       c. Insufficient Evidence of Lost Sale to Valero ......................15

       d. Insufficient Evidence to Support a Jury Verdict Based on WIKA's Failure to Meet its Own Internal, Aggressive Targets for Sales Revenue ..........................................................................15

     3.    Insufficient Evidence to Support Permanent Injunctive Relief, Disgorgement of Profits, Corrective Advertising, Enhanced Damages, Attorneys' Fees, or Prejudgment Interest ............................17

   B.    1279 DATA SHEETS ................................................................20

III.  STATE LAW CLAIMS............................................................20

   A.    GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (COUNT II) AND CONNECTICUT UNFAIR TRADE PRACTICES ACT (COUNT III)................................................................21

   B.    TORTIOUS INTERFERENCE (COUNT IV) ...........................22

   C.    ATTORNEYS' FEES & COSTS UNDER O.C.G.A. § 13-6-11 (COUNT V)................................................................23

IV.   CONCLUSION............................................................................25

i

Defendant Ashcroft, Inc., pursuant to Federal Rule of Civil Procedure 50(a), moves the Court for judgment as a matter of law on all five Counts of Plaintiff WIKA Instrument, LP's First Amended Complaint.[1]

## ARGUMENT & CITATION OF AUTHORITY

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides that, if a party has been fully heard on an issue during a jury trial, and the court finds a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party and grant judgment as a matter of law against the party on any claim or defense that can be maintained only with a favorable finding on that issue.

## II.   LANHAM ACT CLAIMS (COUNT I)

### A.   ASHCROFT'S PRODUCT INFORMATION PAGE

#### 1.   Insufficient Evidence of Literal Falsity

WIKA alleges that Ashcroft's Product Information Page ("PI Page") is literally false and points to the following 7 statements:

---

[1] The bases for judgment as a matter of law in Ashcroft's favor include but are not limited to the bases set forth in this Motion. Ashcroft's Motion expressly incorporates herein any additional arguments made to the Court.

| The 7 Alleged Literal & Necessarily Implied False Statements in the PI Page | PI Page No |
|---|---|
| 1  "phenolic doesn't burn, but instead, will 'char', breaking down to form ash and giving off a little smoke" (First Am. Compl. ¶ 28) | 1 |
| 2  " 'Thermoplastics', like Pocan (Polybutylene Terephthalate) on the other hand, will melt when exposed to heat . . . ." (First Am. Compl. ¶ 28) | 1 |
| 3  "Thermoplastics are also more likely to burn than thermosets . . . . When thermoplastics burn, the material will melt, creating a pool of burning liquid, or even worse, spattering burning molten plastic onto nearby surfaces." (First Am. Compl. ¶ 28) | 1 |
| 4  "Ashcroft has conducted a number of open flame tests comparing the performance of Wika, US Gauge, and Ashcroft Type 1279 process gauges when exposed to the flame of a laboratory burner for a period of 10 seconds. The case material of both the Wika and US Gauge burned intensely when contacted with the flame, posing a risk of spreading a fire. In contrast, the phenolic case of the Ashcroft 1279 did not burn and case integrity was not compromised." (First Am. Compl. ¶ 29) | 2 |
| 5  "Ashcroft has performed extensive thermal testing on the Type 1279 Duragauge process gauge with a phenolic case. No ill effects were noted up to temperatures of 500°F (260°C) a noticeable odor is produced…at 700°F (371°C) some smoke is produced. At 750° (399°C) the phenolic case will char . . . . In one experiment an Ashcroft Type 1279 with a phenolic case, and the competitor's gauges with a thermoplastic case, were heated to 550°F for 30 minutes. After the test, the Ashcroft Type 1279 was relatively undamaged and the gauge was fully functional . . . ." (First Am. Compl. ¶ 31) | 3 |
| 6  *Figure 2:*  Both the Wika and U.S. Gauge with a thermoplastic case completed melted making the gauges non-functional. When in contact with a direct flame, both competitors' gauges with a thermoplastic case have the potential to spread a fire." (First Am. Compl. ¶ 31) | 3 |
| 7   | 3 |

WIKA XSEL 232.34          ASHCROFT 1279          US Gauge 1981

Figure 2:
Gauges elevated to an ambient temperature of 550°F (288°C) for 30 minutes. Both competitive gauge cases, (Wika and US Gauge) above melted as shown. If exposed to a direct flame, the potential to spread a fire exists. In contrast, the integrity of the Type 1279 Duragauge case (Ashcroft) remained intact and did not melt. Gauge calibration was checked before and after the test. The Type 1279 was fully functional and remained within tolerance. (note: the acrylic front ring fully melted causing the gauge window to be captured into the gauge case)

(First Am. Compl. ¶ 33)

2

"A 'literal' falsehood is bald-faced, egregious, undeniable, over the top." *Schering-Plough Health Care Prods., Inc. v. Schwarz Pharma Inc.*, 586 F.3d 500, 514 (7th Cir. 2009). In evaluating whether statements are literally false, a factfinder "must analyze the message conveyed in full context" and "view the face of the statement in its entirety." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Osmose Inc. v. Ciance LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010). If a tests prove advertisement is supported by sufficiently reliable testing, it is not literally false. *Johnson*, 299 F.3d at 1249. The jury would not have a legally sufficient basis to find that the PI Page is literally false.

### Statement 1

WIKA's own expert witness, Dr. Barry Newton, agreed that phenolic will char and break down to form ash and admitted that is what Ashcroft said in Statement 1.

**Statement 2**

Dr. Newton also admitted multiple times that thermoplastic will melt when exposed to heat, and both Dr. Newton and WIKA's Chief Operating Officer, Klaus Gross, admit that thermoplastic, including POCAN, melts at 437°F.

**Statement 3**

Dr. Newton admitted that thermoplastics not treated with a fire retardant are more likely to burn than thermosets. Dr. Newton further admitted that non-fire retardant thermoplastic will melt and create a pool of burning liquid, spattering molten plastic. And Dr. Newton went on to testify that POCAN will melt, will burn, and may drip when it's exposed to a flame. Only one of the 7 allegedly false statements mentions POCAN—the statement that " '[t]hermoplastics', like Pocan (Polybutylene Terephthalate) on the other hand, will melt when exposed to heat . . . ." The word POCAN is not used anywhere else in the PI Page except in that one sentence. And again, both Dr. Newton and Mr. Gross admitted that POCAN will melt at 437°F.

**Statement 4**

Videos of open flame testing Ashcroft performed on pieces of the WIKA XSEL and the Ashcroft 1279 in 2002 (Joint Exhibits 3 (XSEL) and 7 (1279)) have

4

also demonstrated that, when exposed to flame, the thermoplastic material of the XSEL burns intensely while the phenolic material of the 1279 does not:

**Thermoplastic**                                        **Phenolic**



**Statements 5, 6, and 7**

The evidence has also shown that, in 2012, Ashcroft placed both the XSEL and the 1279 gauges in an oven heated to 550°F. After 30 minutes, the 1279 was

relatively undamaged and remained functional. Although the front ring and the back cover of the 1279 gauge melted (because they are made of thermoplastic), the phenolic case was undamaged and "remained in the same conformation," according to Dr. Newton, and the movements and dial remained intact. The entire case of the XSEL gauge, on the other hand, completely melted. The evidence has also shown that this was not the type of test that would require sophisticated lab equipment or protocols; again WIKA's COO, Klaus Gross, stated several times that thermoplastic—including POCAN—**will** melt at 437°F. Dr. Newton agreed that thermoplastic—including POCAN—**will** melt at 437°F. The evidence shows that Ashcroft's elevated temperature test was sufficient to confirm that fact; Dr. Newton agreed that a materials engineer with basic knowledge could confirm this simple proposition with a simple experiment.

Photos of the 1279 (Joint Exhibit 8, p. 8) and the XSEL (Joint Exhibit 8, p. 4) following the 2012 Ashcroft oven test shows that the 1279 remained relatively undamaged and functional while the thermoplastic case of the XSEL completely

melted:



JTX8 Page 8 of 16          JTX1 Page 4



JTX1 Page 5          JTX1 Page 4

Klaus Gross was asked to view, side-by-side, the following photo of the post-oven-test of the 1279 (Joint Exhibit 1, p. 8) and photo of the XSEL gauge from WIKA's own marketing materials (Ashcroft Exhibit 52, p. 38):



JTX8 Page 8 of 16                    Ashcroft Exhibit 52 Page 38

Mr. Gross admitted that, even taking into consideration that the thermoplastic back cover and front ring of the 1279 will melt, the 1279 case still will survive high temperatures better than a thermoplastic case. Mr. Gross admitted that, after 30 minutes in a 550°F oven, you can still see the face and the pointer of the 1279 gauge and admitted that the pointer on the 1279 gauge is not locked up by melted plastic. Mr. Gross further admitted that if the case of thermoplastic gauge melted (as it did in Ashcroft's 2012 oven test), the material would melt onto and lock up some of the components of the gauge, which would not allow someone to read the pressure.

In addition, Dr. Newton admitted that when exposed to a direct flame, thermoplastic will propagate a flame and will melt and drip, and a video posted on WIKA's own website (Joint Exhibit 14) showed that, when exposed to flame for only 30 seconds, the flame caused sparks and flaming material and burned a hole straight through the case:



JTX14

Finally, Figure 2 of the PI Page expressly stated that "the acrylic front ring of the 1279 gauge case fully melted causing the gauge window to be unsecured into the gauge case." Eugene Urbinati and Lou Altieri testified that the image in the PI Page does not show the melted acrylic front ring and thermoplastic back

cover because the purpose of the PI Page was to compare the phenolic material of the 1279 with the thermoplastic material of the XSEL. And Mr. Gross admitted that the image of the back of the 1279 gauge in the PI Page makes it apparent that the back cover had been removed:



**JTX1 Page 5 of 6**

Viewing the message conveyed by the PI Page, in full context, the statements at issue are, at worst, susceptible to more than one reasonable interpretation. None of the evidence at trial would provide the jury with a legally sufficient evidentiary basis to find that the testing supporting the statements made in the PI Page was not sufficiently reliable or that the PI Page was literally false.

### 2.   Insufficient Evidence of Deception, Material Effect on Purchasing Decisions, or Damage

"[A] plaintiff attempting to establish . . . that an advertisement is literally true but misleading, must 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004). Since the evidence shows the PI Page was not literally false, WIKA is not entitled to a rebuttable presumption of deception (*see Johnson*, 299 F.3d at 1247), and WIKA has failed to introduce sufficient evidence that the PI Page deceived or had the capacity to deceive any customers. As this Court has emphasized, absent evidence that the defendant disseminated willfully deceptive, comparative advertising, a plaintiff seeking damages bears the burden of demonstrating actual damages as a result of the deception, the quantum of damages, and a causal link between the violation and the damages. *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1321 (N.D. Ga. 2008).

WIKA seeks damages for alleged lost sales related to 3 specific instances: (1)  an alleged lost bid for Chevron Indonesia; (2) an alleged $12,000 lost bid for Philadelphia Energy Solutions; and (3) an unspecified amount of damage in connection with a presentation Ashcroft made to Valero. But WIKA has failed to

show that the PI Page caused WIKA to lose any of these sales and WIKA has introduced no consumer surveys, market research, expert testimony, or any other evidence that the PI Page deceived or had the capacity to deceive any other customers. WIKA has called no customers as witnesses in its case, the evidence has shown not one of WIKA's witnesses is aware of a single customer who even saw, much less was deceived by, the PI Page, and there is no evidence whatsoever of actual damages.

### a.    Insufficient Evidence of Lost Sale to Chevron Indonesia

As is the case with all of WIKA's witnesses who have testified about the alleged lost sale to Chevron Indonesia, Mr. Placek testified that he had no contact with Chevron Indonesia and relied solely on self-serving hearsay from a salesman who may have had an interest in excusing his own failure to make the sale. The self-serving hearsay consists of one email from Singapore-sales-agent Danny CD to an employee of WIKA Indonesia, Meliana Tanojo (neither of whom testified) that, in and of itself, does not even reference Chevron Indonesia or the PI Page. Mr. Placek admitted he never spoke with Danny CD, never spoke with Ms. Tanojo, and never spoke with a single person at Chevron Indonesia.

12

Furthermore, an email from Ms. Tanojo to Jeff Placek (WIKA Exhibit 223) shows that, for the particular project WIKA contends it lost, Chevron Indonesia required pressure gauges with phenolic cases, which WIKA does not make. Mr. Placek further testified that he was aware that a manufacturer other than Ashcroft won the Chevron Indonesia bid.

WIKA's Chief Revenue Officer, Andrew Firestone, similarly admitted that he has not talked to Chevron and has not heard from and is not aware of any other customers or end-users who ever contacted WIKA about the PI Page. Mr. Firestone admitted that he had no knowledge of Chevron Indonesia ever seeing the PI Page, did not know whether Ashcroft saw the PI Page, and that he had no idea of a dollar figure that WIKA allegedly lost as a result of the "lost" sale to Chevron Indonesia—he'd only be guessing. Mr. Firestone further testified he is not aware of any evidence that the PI Page was a decision-making factor in any sale, cannot identify any customer or opportunity who has been lost by any conduct of Ashcroft, and cannot identify any revenue lost because of the PI Page. Mr. Firestone further testified that if the PI Page had been a decision-making factor for customers, he would have expected his salespersons to report that to him but that none ever did.

And finally, even assuming, arguendo, that WIKA had introduced sufficient evidence of the alleged lost sale to Chevron Indonesia, witness after witness has testified that WIKA US—the Plaintiff in this lawsuit—is a legally separate entity from WIKA Singapore. Although Mr. Placek testified that only WIKA US manufactures the XSEL gauge, WIKA's Chief Operating Officer, Klaus Gross testified that *other WIKA entities* "purchase" XSEL gauges from WIKA US. If any WIKA entity "lost a sale" to Chevron Indonesia (and no evidence has shown that any did), it would have been a sale WIKA Singapore lost, not WIKA US.

### b.    *Insufficient Evidence of Lost Sale to Philadelphia Energy Solutions*

WIKA has failed to introduce evidence sufficient for a reasonable jury to find that the PI Page caused WIKA to lose a sale to Philadelphia Energy Solutions. None of WIKA's witnesses have had direct contact with anyone at Philadelphia Energy Solutions. Moreover, the evidence has shown that WIKA lost the sale not because of Ashcroft's PI Page but because, *in the customer's words*, "[t]he WIKA offering is considered not technically acceptable because of the POCAN case material." *See* Plaintiff's Trial Exhibit 128 and testimony of Ron Donat.

### c.      Insufficient Evidence of Lost Sale to Valero

WIKA has introduced no evidence whatsoever that the PI Page caused it to lose a sale to Valero and has failed to quantify any such alleged damage. Further, WIKA's Chief Revenue Officer, Andrew Firestone acknowledged that <u>WIKA</u> was successful in converting a Valero refinery from Ashcroft to WIKA, not the other way around.

### d.      Insufficient Evidence to Support a Jury Verdict Based on WIKA's Failure to Meet its Own Internal, Aggressive Targets for Sales Revenue

Additionally, Mr. Gross admitted that after the dissemination of the PI Page, WIKA's sales revenue did not decrease and that WIKA's claim for damages in this case is, instead, based on the fact that WIKA's sales have not increased as much as WIKA would have liked. Mr. Gross and Mr. Placek both acknowledged—and WIKA's business records (Ashcroft Exhibit 128, p. 34) show—that WIKA has had problems with product failures, even after introducing its improved XSEL gauge in 2010. The evidence has shown that, as late as 2012, certain refineries in the market refused to use WIKA's XSEL gauge. WIKA's "we would have made even more money" theory is pure conjecture, unsupported by any economic evidence, and

WIKA does not even attempt to account for the reputational problems which, the evidence showed, had dogged WIKA for years.

Additionally, WIKA's Product Manager, Jeff Placek, testified that WIKA had "high expectations" for the XSEL. WIKA's Chief Revenue Officer, Andrew Firestone, admitted that WIKA Germany sets the sales revenue goals for WIKA US, and that WIKA Germany set "aggressive" goals for 2013. According to Mr. Firestone, in September 2013, WIKA US was not hitting the aggressive targets Germany had set, and reasons included that the growth goals set by Germany were "significant," that a lot of new people had been hired in the US, that the economy was not as strong, and that they didn't realize actual sales.

A PowerPoint Presentation given to WIKA US management identified additional reasons WIKA US was falling short of the aggressive goals set by Germany, including the increasing deal size and complexity in negotiations, long sales cycles, rapid addition of US employees, and decreasing morale. *See* Ashcroft Exhibit 91, p. 24. Mr. Firestone admitted that he was concerned about having to explain to Germany why WIKA US was not meeting sales goals and that he would have included any known reason for the shortfall in the 2013 presentation, yet he

did not identify Ashcroft's PI Page—which WIKA received in April, 2012—as a reason for the shortfall.

And even taking into account the problems WIKA was having and the high expectations it set, revenues still were up significantly in 2013, and WIKA had even succeeded in taking business away from Ashcroft, to the tune of $750,000 - $1.2 million, by "converting" AWC, Valin, and a Valero refinery to WIKA. Mr. Firestone admitted that in 2014, WIKA was hitting 100% of its revenue goals; in his words, WIKA was "killing it."     WIKA's claim that it has been injured is purely speculative in fact and amount and WIKA has failed to introduce sufficient evidence to support a finding of liability, much less an award of damages. The authority to issue the remaining types of relief requested by WIKA (injunctive relief, disgorgement of profits, corrective advertising, enhanced damages, attorneys' fees, and prejudgment interest) rests solely within the province of the Court. Without proof of any actual damages, there is nothing for the jury to decide.

### 3. Insufficient Evidence to Support Permanent Injunctive Relief, Disgorgement of Profits, Corrective Advertising, Enhanced Damages, Attorneys' Fees, or Prejudgment Interest

WIKA is not entitled to permanent injunctive relief, because WIKA has failed to introduce evidence that it has suffered any injury, much less an irreparable

17

one: WIKA's remedies at law are adequate, and the balance of hardships favors Ashcroft.

WIKA also has failed to introduce sufficient evidence to support an award of disgorged profits. In a false advertising case, an award of the defendant's profits is appropriate only where (1) the defendant's conduct was willful and deliberate; (2) the defendant was unjustly enriched; or (3) it is necessary to deter future conduct. *Trilink*, 583 F. Supp. 2d at 1322. WIKA has not introduced any evidence that Ashcroft's PI Page was willfully false, that Ashcroft was unjustly enriched by the PI Page, or that disgorgement is necessary to deter future wrongful conduct.

Rather, the evidence has shown that Ashcroft produced the PI Page in response to a WIKA document, comparing the case materials of thermoplastic and phenolic, that was distributed in the marketplace and that first came to Ashcroft's attention in January 2012. *See* Joint Exhs. 10 and 58 and testimony of Eugene Urbinati, Lou Altieri, and Sue Urbinati. WIKA, rather than Ashcroft, initiated the competitive advertising comparing the materials of Ashcroft's and WIKA's cases, and fair competition does not amount to willful behavior. Further, WIKA has failed to introduce evidence of a single sale that WIKA would have made but for the PI Page. Jeff Placek testified that he knew Ashcroft did not win the Chevron

18

Indonesia bid. An RFQ Specialist for WIKA, Ron Donat, testified he did not know who won the Philadelphia Energy Solutions bid. And WIKA has introduced no evidence that the presentation used with Valero (*see* Plaintiff's Exhibit 54 and testimony of Adam Freyler) caused any damage to WIKA.

An award of disgorged profits would not deter future wrongful conduct, either, because the evidence has shown that Ashcroft removed the PI Page from its website in 2014, and there is no evidence that Ashcroft otherwise is still using the PI Page.

WIKA has introduced no evidence that it has incurred corrective advertising costs. WIKA also has introduced no evidence that this is an "exceptional case" warranting an award of attorneys' fees. WIKA has suffered no actual damages, and there is no evidence that Ashcroft has acted fraudulently, willfully, or in bad faith. WIKA is not entitled to enhanced damages, and any award would necessarily be punitive.

Finally, WIKA has provided and there is no basis for recovering prejudgment interest.

### B.    1279 DATA SHEETS

The Court has already held that WIKA is limited to injunctive relief on the 1279 Data Sheets. *See* Summary Judgment Order [Dkt. 191], p. 21. WIKA has failed to introduce any evidence whatsoever that would allow a jury to find that WIKA has established any of the elements of its false advertising claim based on the 1279 Data Sheets. Accordingly, WIKA is not entitled to injunctive relief based on the 1279 Data Sheets.

### III.   STATE LAW CLAIMS

As a threshold matter, Ashcroft is entitled to judgment as a matter of law on WIKA's claim for violation of Georgia's Uniform Deceptive Trade Practices Act ("GUDTPA"), O.C.G.A. § 10-1-372, and tortious interference under Georgia common law because WIKA has failed to introduce evidence that any of the conduct giving rise to its claims based on Georgia law occurred in Georgia, and an award against Ashcroft based on Georgia law would give extraterritorial effect to Georgia law. *See, e.g., State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003); *Huntington v. Attril*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states).

20

A.     **GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (COUNT II) & CONNECTICUT UNFAIR TRADE PRACTICES ACT (COUNT III)**

Because WIKA's Lanham Act claims and its claims for violation of the GUDTPA and the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S.A. § 42-110a et seq, are based on a common nucleus of facts, WIKA's state deceptive trade practices claims hinge on the outcome of its Lanham Act claim. *See* Summary Judgment Order at 24; *Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991); *Omega Engineering, Inc. v. Eastman Kodak Co.* 30 F. Supp. 2d 226, 261 (D. Conn. 1998). WIKA has failed to introduce evidence sufficient to support a jury verdict on its GUDTPA and CUTPA claims for the same reasons it has failed to introduce evidence sufficient to support an award on its Lanham Act claims.

Ashcroft also is entitled to judgment as a matter of law on the CUTPA claim for the additional reason that (1) WIKA has introduced no evidence that the alleged false advertising was material to any customers' decisions or conduct and no evidence that WIKA suffered an ascertainable loss of money or property due to the alleged false advertising, *see Omega Engineering*, 30 F. Supp. 2d at 261; (2) WIKA has not even introduced evidence sufficient to support a finding of

21

liability on its CUTPA claim, so it is not entitled to punitive damages on its CUTPA claim; and (3) WIKA has introduced no evidence that Ashcroft has engaged in outrageous conduct, has been recklessly indifferent to the rights of others, or has intentionally or wantonly violated the rights of others. C.G.S.A. § 42-110g; *Tang v. Bou-Fakhreddine*, 75 Conn. App. 334, 340 (2003).

### B.    TORTIOUS INTERFERENCE (COUNT IV)

To prevail on its claim for tortious interference under Georgia law, WIKA must prove that Ashcroft (1) acted improperly or wrongfully without privilege; (2) with malice or intent to injure; (3) caused an outside party to discontinue or fail to enter an anticipated business relationship with WIKA; and (5) proximately caused damage. *See Disaster Svcs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 740-41 (1998). WIKA has failed to introduce evidence sufficient to satisfy any, much less all, of these elements. WIKA has not established that Ashcroft acted improperly because, inter alia, the evidence has shown that Ashcroft's advertisements were not literally false or otherwise actionable and certainly were not willfully false. WIKA also has failed to introduce evidence of a single customer who refused to enter into a business relationship with WIKA because of any action by Ashcroft. Finally, WIKA has failed to establish that Ashcroft proximately caused any damage to

WIKA or that Ashcroft engaged in any conduct willfully or with malice, fraud, wantonness, oppression, or such an entire want of care that it raises the presumption of a conscious indifference to the consequences of Ashcroft's actions.

Additionally, under Georgia law, the plaintiff must have a proven track record of profits in order to recover anticipated profits allegedly lost as a result of the conduct of another. *See, e.g., Triad Drywall v. Building Materials Wholesale, Inc.*, 686 S.E. 2d 364 (2009); *ReMax of Ga. v. Real Estate Grp. On Peachtree, Inc.*, 201 Ga. App. 287 (1992); *Jacksonville Blow Pipe Co. v. Trammell Hardwood Flooring Co.*, 264 F.2d 717, 719 (5th Cir. 1959); *Molly Pitcher Canning Co. v. Cent. of Ga. Ry. Co.*, 149 Ga. App. 5, 12 (1979). The evidence shows that WIKA touted its XSEL as a new product introduced in April 2010. By the time the PI Page was disseminated in April 2012, the XSEL could not have had a proven track record of profits. In addition, WIKA has failed to establish that any act of Ashcroft was the proximate cause of any alleged "loss" as opposed to WIKA's reputational problems, which caused WIKA to be blackballed by some refineries.

### C.   ATTORNEYS' FEES & COSTS UNDER O.C.G.A. § 13-6-11 (COUNT V)

O.C.G.A. § 13–6–11 provides three grounds for the recovery of attorney's fees: (1) bad faith, (2) stubborn litigiousness, and (3) causing the plaintiff

unnecessary trouble and expense. "As to the second and third bases for relief, it is an absolute defense that a bona fide dispute existed." *Durkin v. Platz*, 920 F. Supp. 2d 1316, 1349 (N.D. Ga. 2013). And "[b]ad faith is bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith *in defending or resisting the claim* after the cause of action has already arisen." *Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1351 (N.D. Ga. 2013) (internal citation omitted). "Bad faith requires more than 'bad judgment' or 'negligence,' rather the statute imports a 'dishonest purpose' or some 'moral obliquity' and implies 'conscious doing of wrong' and a 'breach of known duty through some motive of interest of ill will.'" *Id.* (internal citation omitted).

If anything is clear in this case, it is that there are many bona fide controversies. Because WIKA has introduced no evidence of bad faith on Ashcroft's part and because a bona fide dispute exists between the parties, a reasonable jury would not have a legally sufficient evidentiary basis to award WIKA attorneys' fees under O.C.G.A. § 13-6-11.

## IV.   CONCLUSION

Because a reasonable jury would not have a legally sufficient evidentiary basis to find for WIKA on any of WIKA's claims, the Court should grant judgment as a matter of law against WIKA and in favor of Ashcroft on all of WIKA's claims.

Respectfully submitted this 18th day of April, 2016.

HOLLAND & KNIGHT LLP

*/s/ Caroline Johnson Tanner*
Caroline Johnson Tanner
Georgia Bar No. 392580

*Attorney for Ashcroft, Inc.*

## **LR 7.1(D) FONT COMPLIANCE CERTIFICATION**

The undersigned counsel for Defendant Ashcroft, Inc. hereby certifies that the within and foregoing document was prepared using Times New Roman 14-point font in accordance with Local Rule 7.1 of the United States District Court for the Northern District of Georgia.

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day filed the foregoing using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 18th day of April, 2016.

HOLLAND & KNIGHT LLP

*/s/ Caroline Johnson Tanner*
Caroline Johnson Tanner
Georgia Bar No. 392580

*Attorney for Ashcroft, Inc.*