# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| WIKA INSTRUMENT, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 1:13-cv-00043-CAP |
| ASHCROFT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ASHCROFT, INC.'S MOTION, PURSUANT TO RULES 50(b) AND 59, FOR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR FOR NEW TRIAL OR REMITTITUR <u>AND INCORPORATED MEMORANDUM OF LAW</u>**

HOLLAND & KNIGHT LLP

Caroline J. Tanner (GA Bar No. 392580)
Gregory J. Digel (GA Bar No. 221750)
Keisha O. Coleman (GA Bar No. 844720)
1180 West Peachtree Street NW, Ste 1800
Atlanta, Georgia 30309
(404) 817-8500 (phone)
caroline.tanner@hklaw.com
greg.digel@hklaw.com
keisha.coleman@hklaw.com

Brian G. Leary (*pro hac vice*)
Benjamin M. McGovern (*pro hac vice*)
10 St. James Avenue
Boston, Massachusetts 02116
brian.leary@hklaw.com
benjamin.mcgovern@hklaw.com

*Attorneys for Ashcroft, Inc.*

# **TABLE OF CONTENTS**

FACTUAL BACKGROUND ........................................................................2

ARGUMENT .............................................................................................3

I.  STANDARD OF REVIEW ...............................................................3

II.  THIS COURT SHOULD ENTER JUDGMENT AS A MATTER OF
     LAW FOR ASHCROFT ON WIKA'S CLAIMS, OR,
     ALTERNATIVELY, ORDER A NEW TRIAL..................................4

     A.  THE JURY'S FINDINGS OF DECEPTION AND INJURY
         UNDER THE LANHAM ACT ARE UNSUPPORTED AND
         AGAINST THE WEIGHT OF THE EVIDENCE...............................4

     B.  THE JURY'S FINDING OF LITERAL FALSITY UNDER
         THE LANHAM ACT IS UNSUPPORTED AND AGAINST
         THE WEIGHT OF THE EVIDENCE ...................................7

     C.  THE JURY'S FINDINGS OF LIABILITY UNDER GUDTPA
         AND CUTPA ARE UNSUPPORTED AND AGAINST THE
         WEIGHT OF THE EVIDENCE .......................................10

     D.  THE JURY'S FINDING OF TORTIOUS INTERFERENCE IS
         UNSUPPORTED AND AGAINST THE WEIGHT OF THE
         EVIDENCE .........................................................11

     E.  THE JURY'S FINDING OF LIABILITY UNDER O.C.G.A §
         13-6-11 IS UNSUPPORTED AND AGAINST THE WEIGHT
         OF THE EVIDENCE ................................................12

III.  THIS COURT SHOULD ENTER JUDGMENT AS A MATTER OF
      LAW ON THE JURY'S AWARD OF DAMAGES, OR,
      ALTERNATIVELY, ORDER A NEW TRIAL OR REMITTITUR...........17

     A.  THE JURY'S AWARD OF $3.3 MILLION IN DISGORGED
         PROFITS IS UNSUPPORTED, AGAINST THE WEIGHT OF
         THE EVIDENCE AND BASED ON A MISAPPLICATION
         OF THE LAW ......................................................18

         1.  There is no evidence that the Product Information Page
             benefitted Ashcroft in the amount of $3.3 million. ..................18

i

2.   There was no evidence that Ashcroft's conduct was willful or that an award of profits was necessary to deter future conduct. ........................................................ 22

B.   THE JURY'S AWARD OF $12,189.46 IN ACTUAL DAMAGES IS UNSUPPORTED AND AGAINST THE WEIGHT OF THE EVIDENCE ........................................................ 23

IV.   ASHCROFT IS ENTITLED TO A NEW TRIAL BASED ON THE JURY'S IMPROPER CONSIDERATION OF STRICKEN TESTIMONY, INADMISSIBLE EVIDENCE AND IMPROPER ARGUMENT ........................................................ 25

A.   THE JURY WAS TAINTED BY THE "INCREDIBLE" TESTIMONY OF LAY WITNESS CAMERON REEBALS ........... 25

B.   THE JURY WAS TAINTED BY ITS CONSIDERATION OF HEARSAY EVIDENCE AND SPECULATIVE ARGUMENT REGARDING CHEVRON INDONESIA ........................................................ 28

1.   It was error to admit the Chevron email chain pursuant to the residual hearsay exception. ................................ 29

2.   WIKA made improper use of the Chevron emails closing. ....... 31

V.   ASHCROFT IS ENTITLED TO A NEW TRIAL ON THE BASIS OF CERTAIN ERRONEOUS RULINGS THAT CREATED AN UNEVEN PLAYING FIELD AND RESULTED IN AN UNFAIR TRIAL ........................................................ 32

VI.   ASHCROFT IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT IN FAVOR OF WIKA ON ASHCROFT'S TORTIOUS INTERFERENCE CLAIM. ........................................................ 36

    A.     GEORGIA DOES NOT REQUIRE DIRECT EVIDENCE OF
             TORTIOUS INTERFERENCE.............................................................37

    B.     THE JURY HEARD ADMISSIBLE, DIRECT EVIDENCE OF
             WIKA'S TORTIOUS INTERFERENCE WITH ASHCROFT'S
             EXISTING BUSINESS RELATIONSHIPS........................................39

VII.  ASHCROFT IS ENTITLED TO A NEW TRIAL ON ITS LANHAM
      ACT COUNTERCLAIM BECAUSE THE JURY'S FINDINGS
      WERE AGAINST THE WEIGHT OF THE EVIDENCE............................41

    A.     THE JURY'S FINDING OF NO LITERAL FALSITY IS
             AGAINST THE WEIGHT OF THE EVIDENCE..............................41

    B.     THE JURY'S FINDING OF NO MATERIALITY IS
             AGAINST THE WEIGHT OF THE EVIDENCE..............................43

CONCLUSION ......................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Southern Insurance Group, Inc. v. Goldstein*,
　660 S.E.2d 810 (Ga. Ct. App. 2008)..............................................37, 38

*Arford v. Blalock*,
199 Ga. App. 434 (1991) ........................................................38

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*,
　204 F.3d 683 (6th Cir. 2000) ..................................................21

*Camp v. Eichelkraut*,
　539 S.E.2d 588 (Ga. Ct. App. 2000)...........................................37, 38

*Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.*,
　284 F.3d 302 (1st Cir. 2002)....................................................44

*Chaney v. City of Orlando*,
　483 F.3d 1221 (11th Cir. 2007) .................................................3

*Cleveland v. Home Shopping Network, Inc.*,
　369 F.3d 1189 (11th Cir. 2004) .................................................3

*Disaster Svcs., Inc. v. ERC P'ship*,
　228 Ga. App. 739 (1998) .......................................................12

*Durkin v. Platz*,
　920 F.Supp.2d 1316 (N.D. Ga. (2013)) ..........................................14

*Energy Four, Inc. v. Dornier Med. Sys., Inc.*,
　765 F. Supp. 724 (N.D. Ga. 1991).............................................10

*Fabri v. United Techs. Int'l, Inc.*,
　387 F.3d 109 (2d Cir. 2004) ...................................................17

*Galardi v. Steele-Inman*,
　597 S.E.2d 571 (Ga. Ct. App. 2004)...........................................37, 38

*George Basch Co., Inc. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992) ............................................................18

*Hickson Corp. v. N. Crossarm Co., Inc.*,
357 F.3d 1256 (11th Cir. 2014) ...........................................................4

*Huntington v. Attril*,
146 U.S. 657 (1892)...........................................................................11

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002) .........................................................34

*KEG Tech.*, Inc. v. Laimer,
436 F. Supp. 2d 1364 (N.D. Ga. 2006)........................................21, 22

*Kin Chun Chung v. J.P. Morgan Chase Bank, N.A.*,
975 F.Supp.2d 1333 (N.D. Ga. 2013)...........................................14, 15

*Lamb v. Salvage Disposal Company*,
244 Ga.App. 193, 535 S.E.2d 258 (2000) ..........................................13

*Merck Eprova AG v. Brookstone Pharms, LLC a/k/a Acella Pharms., LLC*,
920 F.Supp. 2d 404 (S.D.N.Y. 2013) .................................................21

*McGinnis v. Am. Home Mortgage Serv., Inc.*,
817 F.3d 1241 (11th Cir. 2016) .......................................3, 25, 28, 41

*N. Am. Medical Corp. v. Axiom Worldwide, Inc.*,
522 F.3d 1211 (11th Cir. 2008) ...........................................................7

*Nissan Motor Acceptance Corporation v. Stovall Nissan*,
224 Ga.App. 295, 480 S.E.2d 322 (1997) ..........................................13

*Omega Engineering, Inc. v. Eastman Kodak Co.*
30 F. Supp. 2d 226 (D. Conn. 1998)...................................................11

*Osmose Inc. v. Ciance LLC*,
612 F.3d 1298 (11th Cir. 2010) ........................................9, 10, 41, 43

*Owatonna Clinic—Mayo Health Sys. V. Med. Protective Co. of Fort Wayne, Ind.*,
639 F.3d 806 (8th Cir. 2011) ............................................................37

*Pelc v. Nowak*,
596 Fed. App'x 768 (11th Cir. 2015) ................................................16

*Porous Media Corp. v. Pall Corp.*,
110 F.3d 1329 (8th Cir. 1999) ...........................................................7

*Rodriguez v. Farm Stores Grocery, Inc.*,
518 F.3d 1259 (11th Cir. 2008) .......................................................17

*Rowland v. Rowland*,
No. 1:04-CV-2068-TWT, 2005 WL 3096169 (N.D. Ga. Nov. 18,
2005) ................................................................................................29

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
200 F.3d 358 (5th Cir. 2000) ...........................................................18

*Sowell v. Blackman*,
512 S.E.2d 713 (Ga. Ct. App. 1999)................................................38

*State Farm Mutual Auto Ins. Co. v. Campbell*,
538 U.S. 408 (2003)..........................................................................11

*Synergistic Int'l, LLC v. Korman*,
470 F.3d 162 (4th Cir. 2006) ...........................................................18

*Trilink Saw Chain, LLC v. Blount, Inc.*,
583 F. Supp. 2d 1293 (N.D. Ga. 2008)............................. 4, 7, 18, 19, 24, 37, 43

**STATUTES**

15 U.S.C. § 1117(a) ...................................................................18, 22

O.C.G.A. § 10-1-373(b)(2) ................................................................16

O.C.G.A § 13-6-11................................................... 12, 13, 14, 15, 16, 17

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .................................................................34

Fed. R. Evid. 807 ......................................................29, 30, 31

Pursuant to Federal Rules of Civil Procedure 50(b) and 59, Ashcroft, Inc. ("Ashcroft") hereby moves the Court for judgment as a matter of law and/or for new trial or remittitur. Based on the judgment and findings entered by this Court, Ashcroft could have to pay WIKA over $9.3 million[1] based on an advertisement that was not false, was seen by two customers at most, and did not influence a single sale of pressure gauges. This award is unsupported and against the weight of the evidence and, if permitted to stand, would represent an extraordinary windfall to WIKA.

The reasons why this award should be reversed or vacated for a new trial are numerous. There was no basis for the jury to have found deception or injury where, as here, the Product Information Page did not deceive anyone or cause either party to win or lose customers. There was no basis for the jury to have found literal falsity because the Product Information Page was reasonably susceptible of more than one interpretation. There was no basis for disgorgement of $3.3 million in profits where no evidence established that Ashcroft's advertising provided a benefit in that amount. The verdict was tainted by the jury's improper consideration of inadmissible evidence related to "crystal ball" projections, the improper introduction of wildly

---

[1] This $9.3 million amount includes approximately $3.3 million in disgorgement contemplated by the judgment (*see* Dkt. 427, ¶ 1) and approximately $6 million WIKA claims for attorneys' fees and costs (*see* Dkt. 438). Although WIKA has yet to itemize its fees and costs, that sum is excessive on its face and will be challenged when the issue is ripe.

speculative evidence regarding Chevron Indonesia, and the cumulative impact of a series of rulings that created an uneven playing field.

Equally flawed is the jury's determination that WIKA's own willfully false advertisements were not actionable under the Lanham Act. It was by definition against the weight of the evidence for the jury to so conclude in light of WIKA's admission that it made "mistakes" with its testing and advertising. This Court echoed that conclusion when it found that WIKA "admittedly" did not have testing to support its advertising claims and "acknowledged" that those claims were false. Ashcroft is entitled to a new trial because the rejection of its counterclaim was against the weight of the evidence.

For the reasons described below, this Court should enter judgment as a matter of law for Ashcroft or order a new trial and/or remittitur.

## **FACTUAL BACKGROUND**

The facts relevant to Ashcroft's post-trial motions have been well-recited in prior filings and orders. *See*, *e.g.*, Ashcroft's Proposed Findings of Fact and Conclusions of Law [Dkt. 419-3].

## ARGUMENT

### I.   STANDARD OF REVIEW

"[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007); *see also Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004) (holding that judgment as a matter of law is appropriate "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue").

A party may also "move for a new trial under Rule 59 on the grounds that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair … and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis v. Am. Home Mortgage Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). In considering a Rule 59 motion for a new trial, this Court is free to independently weigh the evidence and may in its discretion order a new trial if "the verdict is against the clear weight of the evidence … or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Id.* at 1254-55.

## II. THIS COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW FOR ASHCROFT ON WIKA'S CLAIMS, OR, ALTERNATIVELY, ORDER A NEW TRIAL.

### A. The Jury's Findings Of Deception And Injury Under The Lanham Act Are Unsupported And Against The Weight Of The Evidence.

In order to prevail on its claim under the Lanham Act, WIKA was required to: (1) "present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence," *see Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2014); and (2) prove "that it sustained actual harm to its business as a result of the defendant's misrepresentations." *See Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1320 (N.D. Ga. 2008). In its verdict, the jury found that Ashcroft's Product Information Page "likely caused WIKA injury in violation of the Lanham Act" and presumed that deception had been established. *See* Verdict [Dkt. 388], at Question Nos. 2 & 4. These findings are unsupported and against the weight of the evidence.

WIKA introduced no consumer surveys and did not present testimony from a single customer. Instead, WIKA offered only speculative evidence that the supposedly deceptive Product Information Page caused it to lose sales to Chevron Indonesia ("Chevron") and Philadelphia Energy Solutions ("PES"). This Court instructed the jury that WIKA failed to meet its burden of proof with respect to Chevron and that only the PES claim could be considered. *See* Trial Tr., Vol. IX

(jury charge) [Dkt. 416], at 145:15 – 21. ("The only sale to be considered for damages is the Philadelphia Energy Systems sale.… The Chevron Indonesia sale cannot be considered by the jury for any kind of award of damages."). But there was no evidence that PES was deceived or that Ashcroft caused WIKA to lose the PES sale.

WIKA offered no testimony from any PES employee. Instead, WIKA proffered its own EPC quote specialist to testify that although he had never communicated directly with PES, he had reviewed emails from PES' agent that led him to "believe[]" WIKA had been disqualified from the PES opportunity because of the Product Information Page. *See* Trial Tr., Vol. IV (Donat) [Dkt. 416], at 271:18 – 21; 284:18 – 20; 291:18 – 20. Even if Mr. Donat's guess about PES' intent was enough to support a verdict (which it is not), his self-serving interpretation of the emails was incorrect.

The emails referenced by Mr. Donat demonstrate that PES' agent could not have been deceived by the Product Information Page because the email highlighted subject matter (the melting point of POCAN) that even WIKA concedes is true. *Compare* JTX 35 [Dkt. 397], at p. 12 *with* Trial Tr., Vol. III (Newton) [Dkt. 399], at 60:19 – 61:9. More fundamentally, these emails also identify the precise reason why PES did not purchase WIKA's thermoplastic gauge case: the XSEL gauge did not

meet an internal PES standard. *See* PTX 128 [Dkt. 394], at p. 1 of 13 ("I have been directed by PES … to comply with PES Standard 0435 regarding case material. The WIKA offering is considered not technically acceptable because of the POCAN case material."). The evidence showed that PES' own pre-existing standard, which required phenolic case material, and not Ashcroft's advertisement, disqualified WIKA's gauge.

Even assuming, *arguendo*, that the jury could infer that the Product Information Page had some tangential bearing on PES' decision to apply its own internal standards, the record still shows no injury. It was undisputed that, even after viewing the Product Information Page, PES did not buy an Ashcroft product but instead bought a **thermoplastic** gauge case from another competitor. *See* Trial Tr., Vol. VIII (Freyler) [Dkt. 415], at 208:8 – 209:1. WIKA's theory at trial was that the Product Information Page confused consumers into buying Ashcroft's Type 1279 gauge by claiming falsely that phenolic cases were superior to thermoplastic. But the evidence demonstrated conclusively that PES did the exact opposite of WIKA's theory. In these circumstances, WIKA failed to meet its burden of proving deception

or injury, and this Court should therefore enter judgment as a matter of law for Ashcroft on WIKA's Lanham Act claim, or, alternatively, order a new trial.[2]

> B. The Jury's Finding Of Literal Falsity Under The Lanham Act Is Unsupported And Against The Weight Of The Evidence.

In addition to deception and injury, WIKA was required to prove Ashcroft's Product Information Page was literally false or misleading in order to prevail on its Lanham Act claim. *See, e.g., N. Am. Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008). Though the jury found the advertisement "literally false" (*see* Verdict [Dkt. 388], at Question No. 1[3]), this finding was unsupported and against the weight of the evidence.

WIKA did not dispute at trial that the Product Information Page accurately stated that phenolic gauge components are safer than thermoplastic components in a

---

[2] For two reasons, there is no merit to any suggestion by WIKA that its burden of proving deception or injury was satisfied by a "presumption." First, as explained in Section II.B, *infra*, WIKA is not entitled to a presumption because the jury lacked a sufficient basis to conclude that the Product Information Page was literally false. Second, to the extent that these presumptions are recognized in the Eleventh Circuit, Ashcroft successfully rebutted them with the evidence (summarized above) that PES was not deceived by the Product Information Page and WIKA did not suffer harm. *See, e.g., Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1333 (8th Cir. 1999); *Trilink*, 583 F. Supp. 2d at 1321 (presumption of injury can be rebutted by evidence that plaintiff "did not suffer its alleged marketplace injuries").

[3] Because of the way the jury verdict form was structured, the jury did not reach the question of whether the Product Information Page was misleading. *See* Verdict [Dkt. 388], at Question No. 3.

fire or elevated temperature environment. *See generally* JTX 1 [Dkt. 397]. Nor could it. Record evidence demonstrates that WIKA itself warns customers that thermoplastic cases can be a safety risk at high ambient temperatures because they melt. *See* DTX 52 [Dkt. 395], at pp. 36 & 38. WIKA's testifying expert, Dr. Barry Newton, even admitted that:

- WIKA's thermoplastic XSEL case will melt at a temperature of 437 degrees (*see* Trial Tr., Vol. III (Newton) [Dkt. 399], at 60:19 – 61:9);

- WIKA's thermoplastic XSEL case will burn, melt, drip, and provide fuel to a fire while exposed to a flame (*see id.* at 62:6 – 63:18);

- Thermoplastic materials untreated with fire retardant can create a pool of burning liquid or spatter molten plastic when they melt (*see id.*, at 61:10 – 61:15);

- The phenolic components of Ashcroft's Type 1279 gauge will never melt, (*see id.*, at 69:8 – 69:12); and

- Ashcroft's elevated temperature tests were reliable enough to let its engineers confirm the simple proposition of science that thermoplastic melts and phenolic does not (*see id.*, at 87:22 – 88:4).

Unable to challenge Ashcroft's truthful comparison between the safety of phenolic and thermoplastic, WIKA instead argued that Ashcroft's "big fib" was to define the term "case" to exclude the rear cover of a gauge, which allegedly hid from

consumers the flammability of the 1279's thermoplastic rear cover.[4] But there is a legitimate dispute regarding the proper definition of "case" that precludes a finding of literal falsity.

It is well-established in the Eleventh Circuit that "if the language or graphic [of an advertisement] is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Osmose Inc. v. Ciance LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010). Here, the jury could not have concluded that the only reasonable definition for "case" includes its rear cover. Indeed, there was ample evidence that WIKA, like Ashcroft, actually defines that term to **<u>exclude</u>** the rear cover. For example, the evidence demonstrated that:

- WIKA assigns separate part numbers to the case and rear cover of its XSEL gauge (*see* Trial Tr., Vol. VI (Wang) [Dkt. 404], at 210:5 – 210:7);

- Both WIKA and Ashcroft publish blow-out diagrams of their gauges which depict the case and rear cover as separate parts (*see* JTX 20 & JTX 21 [Dkt. 396], at p. 10);

- A WIKA employee who serves on the ASME B40 committee testified that he interprets the standards published by that entity as defining the case and

---

[4] *See* Trial Tr., Vol. IX (WIKA closing) [Dkt. 416], at 78:14 – 79:22 ("Because, [Ashcroft says], we were only talking about the case of the gauges and not the back because it's not part of the case, ergo, we don't have to tell you about the problems with the back and the spattering and all of that … And if you don't believe this claim, if you don't believe that the case doesn't include the back—and there's no reason you should—you will readily conclude that the PI Page and the statements made in there are false.").

rear cover of a pressure gauge as separate components (*see* Trial Tr., Vol. VI (Weissner) [Dkt. 404], at 159:24 – 160:6);

- WIKA published an advertisement entitled "Process Gauge Case Material Comparison" that excludes the rear cover from its definition of case by defining the Ashcroft case as being comprised of "phenolic" only (*see* JTX 58 [Dkt. 396]); and

- WIKA published a video advertisement in which the narration refers to the case of the XSEL while depicting a gauge with its rear cover clearly removed (*see* JTX 14 [Dkt. 396]).

The jury could **only** have found literal falsity if it concluded that the **only** reasonable definition of "case" includes the rear cover. No such finding was possible when the evidence demonstrated that even WIKA defines its case differently in practice. Because "case" is susceptible to more than one reasonable interpretation, the finding of literal falsity is unsupported and against the weight of the evidence. *See Osmose Inc.,* 612 F.3d at 1308. This Court should therefore enter judgment as a matter of law for Ashcroft on WIKA's Lanham Act claim, or, alternatively, order a new trial.

C.   The Jury's Findings Of Liability Under GUDTPA And CUTPA Are Unsupported And Against The Weight Of The Evidence.

This Court instructed the jury properly that the conduct giving rise to WIKA's claims under GUDTPA and CUTPA was the same conduct that forms the basis for its Lanham Act claim. *See* Trial Tr., Vol. IX (jury charge) [Dkt. 416], at 148:4 – 148:8, 150:1 – 150:6; *see also Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F.

Supp. 724, 731 (N.D. Ga. 1991) (claims under GUDTPA involve "same dispositive questions as the Federal Lanham Act"); *Omega Engineering, Inc. v. Eastman Kodak Co.* 30 F. Supp. 2d 226, 261 (D. Conn. 1998) (claims under CUTPA require plaintiff to prove "ascertainable loss of money or property" due to unfair or deceptive practice).

The jury findings of liability under GUDTPA and CUTPA are therefore unsupported and against the weight of the evidence for the same reasons that WIKA's Lanham Act claim is deficient (described in Sections II.A and II.B, *supra*). WIKA's claim under GUDTPA also fails for the additional reason that WIKA did not introduce any evidence that the conduct giving rise to its claim occurred in Georgia. *See, e.g., State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003); *Huntington v. Attril*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states."). This Court should therefore enter judgment as a matter of law for Ashcroft on WIKA's claims under GUDTPA and CUTPA, or, alternatively, order a new trial.

D.     The Jury's Finding Of Tortious Interference Is Unsupported And Against The Weight Of The Evidence.

In its verdict, the jury found that Ashcroft tortiously interfered with WIKA's business relations but awarded $0 in compensatory damages. *See* Verdict [Dkt. 388],

11

at Question Nos. 24-25. The jury's finding of liability is unsupported and against the weight of the evidence.

To prevail on its tortious interference claim, WIKA was required to prove that Ashcroft: (1) acted improperly or wrongfully without privilege; (2) with malice or intent to injure; (3) caused an outside party to discontinue or fail to enter an anticipated business relationship with WIKA; and (4) proximately caused damage. *See, e.g., Disaster Svcs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 740-41 (1998). For the reasons described in Section II.B, *supra*, there was no evidence that Ashcroft acted improperly, wrongfully, or with malice or intent to injure in publishing an advertisement that was not literally false. Similarly, for the reasons described in Section II.A, *supra*, there was no evidence whatsoever to indicate that Ashcroft caused a third party (like PES) to fail to enter an anticipated business relationship with WIKA, let alone that Ashcroft's advertisement was the proximate cause of injury to WIKA (as reflected by the jury's decision to award $0 in compensatory damage). This Court should therefore enter judgment as a matter of law for Ashcroft on WIKA's tortious interference claim, or, alternatively, order a new trial.

E.   The Jury's Finding Of Liability Under O.C.G.A § 13-6-11 Is Unsupported And Against The Weight Of The Evidence.

O.C.G.A. § 13-6-11 "does not create an independent cause of action, but merely permits, in certain limited circumstances, the recovery of the expenses of

litigation incurred as an additional element of damages." *Lamb v. Salvage Disposal Co.*, 535 S.E.2d 258, 261 (Ga. Ct. App. 2000). O.C.G.A. § 13-6-11 provides a vehicle for the collection of attorneys' fees **only** where the underlying claim to which it attaches does not itself contain such a mechanism. Otherwise, there could be an impermissible double recovery of attorneys' fees. *Nissan Motor Acceptance Corp. v. Stovall Nissan*, 480 S.E.2d 322 (Ga. Ct. App. 1997). Since the Lanham Act, GUDTPA, and CUTPA each have their own fee shifting provisions, WIKA could recover under O.C.G.A. § 13-6-11 **only** if it had prevailed on its claim for tortious interference.

As shown in Section I.D, above, WIKA failed to prove the essential elements of the tortious interference claim. First, the jury expressly found that WIKA suffered no damage associated with tortious interference as a result of the challenged advertisements. *See* Dkt. 388, at p. 8. Had the claim been presented to the jury on a general verdict, the verdict would have been in favor of Ashcroft on this claim. In addition, as shown above, WIKA produced no evidence to establish the other elements of the tort: there was no evidence that Ashcroft acted improperly, wrongfully, or without privilege; that Ashcroft acted with malice or intent to injure; or that any customer or potential customer chose not to do business with WIKA because of the challenged advertisements. Accordingly, because the underlying

tortious interference claim fails, there is nothing to which the claim under O.C.G.A. § 13-6-11 can attach, and the Court should enter judgment in Ashcroft's favor on that claim.

Even if O.C.G.A. § 13-6-11 applied to WIKA's other claims, Ashcroft still is entitled to judgment in its favor. O.C.G.A. § 13-6-11 authorizes an award of fees only upon a showing of (1) bad faith, (2) stubborn litigiousness, or (3) causing unnecessary trouble and expense. Bad faith does **not** include "defending or resisting the claim after the cause of action has already arisen." *Kin Chun Chung v. J.P. Morgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1351 (N.D. Ga. 2013). "As to the second and third bases for relief, it is an absolute defense that a bona fide dispute existed." *Durkin v. Platz*, 920 F. Supp. 2d 1316, 1349, (N.D. Ga. 2013). Here there were indisputably bona fide disputes as to liability and damages. WIKA's motion for summary judgment in its favor on its claim was denied. *See* Dkt. 191. The court dismissed WIKA's claim for good will damages. *See* Dkt. 323. WIKA's Rule 50 motion on this claim was denied. *See* Dkt. 415. The jury returned a verdict for less than one-fourth of the damages requested by WIKA. *See* Dkt. 388, at p.3. The Court struck the "crystal ball" testimony of WIKA's damage witness. The jury awarded no damages under GUDTPA and CUTPA. *See* Dkt. 388, at p. 7 and 8. And, rather than the millions of dollars of actual damages WIKA claimed (*see* Joint Pretrial Order

[Dkt. 208-4], at pp. 9-10, in which WIKA claimed **<u>actual</u>** damage in an amount of $1,715,000), the Court limited the potential actual damage award to $12,189.46. WIKA's claim of $1.7 million in actual damages was almost entirely unsustainable.[5] These many bona fide controversies require the entry of judgment in Ashcroft's favor on WIKA's § 13-6-11 claim.

Finally, WIKA failed to establish bad faith in the underlying transaction. Bad faith means more than just bad judgment or negligent error; it requires dishonesty, moral obliquey or conscious wrongdoing motivated by ill will. *See Kin Chun Chung*, 975 F. Supp. 2d at 1351. The challenged Ashcroft advertisements were not designed or published to deceive customers, nor with malicious intent to injure WIKA. The evidence showed no injury to WIKA. Rather, the Product Information Page was developed as a direct response to WIKA's "Process Gauge Case Material Comparison," which asserted that WIKA's thermoplastic case was as impervious to flames and high temperatures and was superior to Ashcroft's phenolic case:

- WIKA's "Process Gauge Case Material Comparison," received by Ashcroft in January 2012, claimed WIKA's POCAN case had "good form stability at high temperatures." *See, e.g.,* JTX 55 & 58 [Dkt. 396]; Trial

---

[5] The same is also true of WIKA's claim for disgorgement. Although Ashcroft contends that no disgorgement is appropriate, its good faith in defending against that aspect of WIKA's claim is amply supported by the fact that the judgment amount of $3.3 million is nearly $10 million less than the $13.2 million in profits sought by WIKA. *See* Joint Pretrial Order [Dkt. 208-4], at p. 11.

Tr., Vol. VII (Altieri) [Dkt. 405] , at 201:17 – 205:4; Trial Tr., Vol. VIII (Payne) [Dkt. 415], at 37:22 - 39:7.

- Ashcroft performed research to test that claim. *See, e.g.,* JTX 54, 56 [Dkt. 396]; Trial Tr., Vol. VII (Altieri) [Dkt. 405], at 207:7 – 208:17; Trial Tr., Vol. VIII (Payne) [Dkt. 415], at 42:4-10.

- Ashcroft employees saw a similar "Technical Brief," in April 2012, in which WIKA stated that POCAN was "fully substitutable for Phenolic in process applications." *See* JTX 57 [Dkt. 396]; Trial Tr., Vol. VII (Altieri) [Dkt. 405], at 229:2 – 230:22; Trial Tr., Vol. VIII (Payne) [Dkt. 415], at 57:5-25.

- Ashcroft disseminated the Product Information Page in April 2012, as a response to the WIKA comparisons. Trial Tr., VIII (Payne) [Dkt. 415], at 41:16-20.

Beyond WIKA's speculation and conjecture that Ashcroft employees conceived of the Product Information Page as part of a plan to "kill" WIKA, there was no evidence that Ashcroft acted in bad faith to deceive consumers.[6]

---

[6] The jury's verdict also recommended awards of fees and costs under the Lanham Act, GUDTPA and CUTPA. *See* Verdict [Dkt. 388], at Question Nos. 14, 18 & 23. Ashcroft has maintained consistently that these portions of the verdict were merely advisory. However, in an abundance of caution with respect to its appellate rights, Ashcroft respectfully submits that if these findings were in fact binding, they are unsupported and against the weight of the evidence for the same reasons that the award under O.C.G.A. § 13-6-11 is deficient. *See Pelc v. Nowak*, 596 Fed. App'x 768, 770 (11th Cir. 2015) (explaining that, to obtain fees under Lanham Act, plaintiff must demonstrate existence of an "exceptional case" in which the defendant acted in a "malicious, fraudulent, deliberate or willful manner," or where there was evidence "of fraud or bad faith" and affirming fees where defendant admitted using plaintiff's trademarks to attract customers to defendant's website so he could defame plaintiff and invade her privacy); O.C.G.A. § 10-1-373(b)(2) (court has discretion to award fees to prevailing party under GUDTPA if "[t]he party charged with a

Because there is no viable claim to which the derivative O.C.G.A. § 13-6-11 claim can attach, and because WIKA has failed to prove any of the prerequisites for recovery of attorneys' fees under that statute, Ashcroft is entitled to judgment in its favor on that claim.

## III.  THIS COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON THE JURY'S AWARD OF DAMAGES, OR, ALTERNATIVELY, ORDER A NEW TRIAL OR REMITTITUR.

"As a general rule, a remittitur order reducing the jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008). Here, the damages awarded by the jury were unsupported, against the weight of the evidence, and far exceeded any amount that could have been awarded by a rational jury pursuant to proper jury instructions. This Court should therefore enter judgment as a matter of law for Ashcroft on the damage award, or, alternatively, order a new trial or remittitur.

---

deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive."); *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 128 (2d Cir. 2004) (award of fees under CUTPA "is committed to the discretion of the trial court").

A.     <u>The Jury's Award Of $3.3 Million In Disgorged Profits Is Unsupported, Against The Weight Of The Evidence And Based On A Misapplication Of The Law.</u>

1.     There is no evidence that the Product Information Page benefitted Ashcroft in the amount of $3.3 million.

The Lanham Act is clear: disgorgement "shall constitute **compensation and not a penalty**." *See* 15 U.S.C. § 1117(a) (emphasis supplied). Courts routinely emphasize that there must be a connection between the plaintiff's harm and the defendant's profits to justify disgorgement.

For example, several appellate courts have identified the connection between false advertising and profits as an important factor bearing on disgorgement. *See, e.g., Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 174-75 (4th Cir. 2006) (that no sales were diverted weighed against disgorgement); *Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 369 and 372 (5th Cir. 2000) (affirming denial of disgorgement where the "evidence of unjust enrichment and diversion of sales [was] speculative at best"); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992) (vacating disgorgement award where it was uncertain that defendant benefited from unlawful conduct). This Court held in *Trilink Saw Chain, LLC v. Blount, Inc.* that "a plaintiff entitled to profits is not necessarily entitled to all of a defendant's profits; instead, 'there should be some connection between harm and recovery so that the award does not contravene the Lanham Act's mandate that any monetary

18

award constitute compensation and not a penalty.'" 583 F. Supp. 2d 1293, 1322-23 (N.D. Ga. 2008). Ashcroft requested an instruction in accordance with these principles:

> The amount of profits that you disgorge, if any, is left to your discretion. However, you may not award disgorgement of profits solely as a way to punish Ashcroft, and you therefore cannot award disgorgement of profits unless you conclude that Ashcroft benefitted from the Product Information Page. Put differently, if you decide to disgorge profits, you may only award WIKA that portion of Ashcroft's profits, if any, that it obtained because of the Product Information Page.

Ashcroft, Inc.'s First Amended Proposed Jury Instructions [Dkt. 338], at Proposed Jury Charge No. 9.

This Court, however, stated: "Well, I'm not using No. 9 because I'm going to use WIKA's charge on disgorgement of profit, and Ashcroft doesn't have that claim." Trial Tr., Vol. IX (charge conference) [Dkt. 416], at 56:6 – 56:8. The jury subsequently awarded WIKA $3.3 million in disgorged profits. *See* Verdict [Dkt. 388], at Question No. 8. It was error for this Court to reject Ashcroft's proposed instruction, and a new trial is warranted here because the absence of that instruction permitted the jury to award $3.3 million without finding the requisite connection between the false advertising and Ashcroft's profits.

Nor could such a connection have been found even if the jury had been instructed properly. WIKA was completely unable to prove that Ashcroft made a

19

single sale **because of** the Product Information Page. Although WIKA attempted to prove that it lost opportunities with Chevron and PES because of the advertisement, it was undisputed that neither company purchased an Ashcroft product after viewing the Product Information Page.[7] *See* Trial Tr., Vol. VIII (Freyler) [Dkt. 415], at 208:5-22. Nor could the jury have inferred that profits were diverted from WIKA to Ashcroft. To the contrary, both companies experienced a decrease in unit shipments from 2012 to 2013 (the first year that the Product Information Page circulated). But Ashcroft's shipments decreased by a **greater** percentage than WIKA's shipments (*compare* JTX 41 [Dkt. 396] (shipments of Ashcroft 1279 dropped approximately 3.6%) *with* JTX 38 [Dkt. 396] (shipments of WIKA XSEL dropped less than 1%)),[8] thus proving that the Product Information Page did not benefit Ashcroft and that disgorgement represented a windfall to WIKA. Accordingly, this Court should enter judgment as a matter of law for Ashcroft on the disgorgement remedy. *See, e.g.,*

---

[7] And, even if it were proper to consider the PES transaction as a lost opportunity, the *de minimus* value of that opportunity (alleged as $12,189.46) would hardly support an equitable award of disgorged profits in the amount of $3.3 million.

[8] WIKA lay witness Cameron Reebals offered improper expert testimony that WIKA's failure to meet his "crystal ball" growth projections "must have" been caused by the Product Information Page because he had purportedly eliminated all other potential causes, but this Court struck that testimony as "incredible." *See* Trial Tr., Vol. V (Reebals) [Dkt. 414], at 169:17 – 172:20; 177:12 – 178:8. The jury's improper consideration of this stricken testimony represents yet another reason why a new trial is warranted.

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695 (6th Cir. 2000) (absent "proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits"); *Merck Eprova AG v. Brookstone Pharms., LLC a/k/a Acella Pharms., LLC*, 920 F. Supp. 2d 404, 431 (S.D.N.Y. 2013) (refusing disgorgement where defendant did not profit from violation and plaintiff would have therefore received "impermissible windfall"); *KEG Techs., Inc. v. Laimer,* 436 F. Supp. 2d 1364 at 1373 (N.D. Ga. 2006) ("[A]ny award of profits should be limited to those profits [defendants] enjoyed as a consequence of selling certain misidentified products . . . .").

Finally, even assuming, *arguendo*, that it was proper for the jury to infer that the Product Information Page had some correlation to Ashcroft's profits, there still was no evidence whatsoever that quantified those profits in the specific amount of $3.3 million. The jury was presented with dueling calculations of Ashcroft's 1279 profits. WIKA's expert witness, Robert Hutchins, testified that Ashcroft earned $13.279 million in profits from the sale of the 1279 gauge while the Product Information Page was in circulation. *See* Trial Tr., Vol. V (Hutchins) [Dkt. 414], at 205:19 – 206:3. Ashcroft's chief financial officer, John Vuono, calculated the company's profits as $1.108 million for the same time period. *See* JTX 41 [Dkt. 396]; Trial Tr., Vol. VIII (Vuono) [Dkt. 415], at 108:22 – 109:8.

Confronted with profit calculations of $13.2 million and $1.1 million, the jury awarded $3.3 million. There is no evidence supporting this specific figure as profits Ashcroft derived from the Product Information Page (if any). Possibly, the jury arbitrarily picked $3.3 million at random or compromised by trebling the $1.1 million figure calculated by Mr. Vuono.[9] Either way, the award of $3.3 million in profits has no basis in the evidence and directly contravenes the Lanham Act's prohibition against punitive damage. *See* 15 U.S.C. § 1117(a). This Court should order a new trial or remittitur on the disgorgement remedy as an alternative to entering judgment as a matter of law.

> 2.   There was no evidence that Ashcroft's conduct was willful or that an award of profits was necessary to deter future conduct.

In awarding disgorgement of profits, the jury concluded that Ashcroft acted willfully in publishing the Product Information Page or that an award of profits was

---

[9] In this regard, the jury could have been confused into believing that it was authorized to treble profits in the same way that it trebled actual damages pursuant to the enhanced damages provision of the Lanham Act. *See* Trial Tr., Vol. IX (jury charge) [Dkt. 416], at 146:3 – 146:8 (instructing jury that it was authorized to treble actual damages up to "three times the amount entered as compensatory damages after the enhancement."). But trebling of profits is impermissible. *See, e.g., KEG Techs., Inc.*, 435 F. Supp. 2d at 1374 ("As for profits, however, the court is not authorized to award up to three times the amount proved. For profits, the court is constrained to award the amount proved…").

necessary to deter future conduct. *See* Verdict [Dkt. 388], at Question No. 7. This finding is unsupported and against the weight of the evidence.

With respect to willfulness, for the reasons stated in Section I.E, *supra*, there was no evidence that Ashcroft willfully intended to deceive the marketplace. With respect to deterrence, the evidence established that Ashcroft removed the Product Information Page from its website as of July 2014 and also instructed its distributors to discontinue use of that advertisement at the same time. *See* JTX 15 [Dkt. 396]. And there was no credible evidence at trial that any customers ever saw, let alone were deceived by, the Product Information Page in the nearly two years since it has been removed from circulation. For these additional reasons, this Court should enter judgment as a matter of law for Ashcroft on the disgorgement remedy, or, alternatively, order a new trial.

B.    The Jury's Award Of $12,189.46 In Actual Damages Is Unsupported And Against The Weight Of The Evidence.

This Court instructed the jury properly that "[t]o decide amount that WIKA has been damaged, you must determine the gross amount WIKA would have received in the absence of Ashcroft's wrongful conduct and then subtract from that amount the expenses WIKA would have incurred, including such things as labor, material, marketing and promotional expenses WIKA would have had if Ashcroft's conduct had not occurred." *See* Trial Tr., Vol. IX (jury charge), at 156:4 – 156:10

[Dkt. 416]; *see also Trilink*, 583 F. Supp. 2d at 1322 n.15 (holding that Lanham Act plaintiff "bear[s] the burden at trial of demonstrating not only entitlement to damages, but also the quantum of those damages."). The jury simply disregarded this instruction in awarding WIKA $12,189.46 in actual damages. *See* Verdict [Dkt. 388], at Question No. 5.

The only evidence regarding WIKA's alleged actual damage was the testimony of Mr. Donat that WIKA offered to sell PES XSEL gauges for "roughly $12,000." *See* Trial Tr., Vol. IV (Donat) [Dkt. 400], at 271:8 – 271:14. Put differently, WIKA claimed it would have received the gross amount of $12,189.46 if it won the PES bid. Contrary to this Court's instructions, the jury did not deduct the expenses associated with this hypothetical sale, and instead awarded the **entire** gross amount as damages.[10] This Court should therefore enter judgment as a matter of law for Ashcroft on the jury's award of actual damages, or, alternatively, order a new trial or remittitur.

---

[10] Record evidence established WIKA's variable margin on its XSEL was approximately 48%. *See* JTX 38 [Dkt. 396].

## IV.   ASHCROFT IS ENTITLED TO A NEW TRIAL BASED ON THE JURY'S IMPROPER CONSIDERATION OF STRICKEN TESTIMONY, INADMISSIBLE EVIDENCE AND IMPROPER ARGUMENT.

Substantial errors "in admission or rejection of evidence" are grounds for granting a new trial under Federal Rule of Civil Procedure 59. *See McGinnis*, 817 F.3d at 1254. Here, a new trial is warranted based on the jury's improper consideration of stricken testimony related to WIKA's "crystal ball" projections and the introduction of hearsay evidence and speculative argument regarding WIKA's alleged lost opportunity with Chevron Indonesia.

### A.   The Jury Was Tainted By The "Incredible" Testimony Of Lay Witness Cameron Reebals.

WIKA proffered the lay testimony of its former director of business planning, Cameron Reebals, in an effort to establish an injury allegedly suffered from the Product Information Page. In pertinent part, Mr. Reebals testified as follows:

- He projected XSEL sales for the years 2012 and 2013 using software called "ForecastX." This software, which Mr. Reebals referred to repeatedly as his "crystal ball," supposedly analyzed four different "indicators" of macro-economic trends in certain markets. *See* Trial Tr., Vol. V (Reebals) [Dkt. 414] , at 89:19 – 95:4. Mr. Reebals also calculated the amount by which he believed the actual XSEL sales underperformed his crystal ball projections for 2012 ($502,074) and 2013 ($940,479). *See id.* at 114:20 – 118:7; 125:1 – 127:8.

- When asked why he believed the XSEL sales had underperformed his crystal ball, Mr. Reebals testified that "[w]hen I found out about the

[Product Information Page], I figured that was it," because "I just ruled out all the other possible causes." *Id.* at 113:20 – 114:16.

- Mr. Reebals testified that the Product Information Page also caused WIKA to lose specific business opportunities with Chevron Indonesia in the amount of $1.2 million and with PES in the amount of "about [$]12,000 something." *See id.*, at 118:21 – 119:4.

On cross-examination, it was apparent that Mr. Reebals lacked any personal knowledge whatsoever to support his testimony regarding WIKA's purported injury and damage. For example, Mr. Reebals admitted that:

- He could only "speculat[e] based on his experience" as to the reasons why the XSEL experienced a flat growth rate; does not know how Ashcroft distributed its Product Information Page; did not "know for sure" when that advertisement was published; had noticed shortfalls against his crystal ball projections even before the advertisement was disseminated; did not account for customer feedback in his projections; did not consult with WIKA's marketing team before making his projections; and was unaware that WIKA's marketing team had predicted flat growth for the XSEL that it attributed to internal deficiencies such as past product failures. *See id.* at 144:2 – 148:12; 149:10 – 156:14.

- He had no communications with Chevron Indonesia; does not know if Chevron saw the Product Information Page; never saw the Chevron bid; does not know if WIKA would have won the business but for the advertisement; did not know if the business was for a 5-year term; and does not have any knowledge of the actual magnitude of the lost opportunity beyond the $1.2 million estimation in WIKA's alleged bid. *See id.* at 136:8 – 140:20.

- He was not personally involved in any communications with PES; does not personally know if PES actually saw the Product Information Page;

and doesn't know if that advertisement would have made a difference in the sale. *See id.* at 140:21 – 142:3.

- He did not conduct any interviews or consumer surveys to assess the impact of the Product Information Page in the marketplace. *See id.* at 142:4 – 142:10.

Based on these admissions, this Court struck Mr. Reebals' testimony as "absolutely incredible," "unworthy," and "absolutely a guess," and further instructed the jury to remove it from their consideration because WIKA had attempted to introduce improper expert opinion in the guise of lay testimony. *See id.* at 169:17 – 172:1; 177:12 – 178:8.

Unfortunately, this curative instruction appears to have been disregarded by the jury. As set forth in Sections II.A, and III.A.1, *supra*, there is no evidence in the record to prove that WIKA was injured by the Product Information Page or that the advertisement gained Ashcroft $3.3 million in profits. Before it was stricken, however, the jury heard Reebals' "incredible" opinion that the Product Information Page caused WIKA to underperform his "crystal ball" projections by over $1.4 million in 2012/2013, and lose opportunities with Chevron and PES of $1.2 million and $12,000, respectively. Given the absence of any other evidence to explain its verdict, it is most likely that the jury simply was unable to disregard Mr. Reebals' unreliable and improper testimony when it deliberated on the topics of injury,

damages and disgorgement, just as the Court observed at the conclusion of trial.[11] Because the jury was irrevocably tainted by the stricken testimony of Mr. Reebals, this Court should grant Ashcroft a new trial to prevent a miscarriage of justice. *See, e.g., McGinnis*, 817 F.3d at 1254 (court may grant a new trial under Rule 59 if "the trial was not fair" or if a jury verdict "will result in a miscarriage of justice.").

> ### B.     The Jury Was Tainted By Its Consideration Of Hearsay Evidence And Speculative Argument Regarding Chevron Indonesia.

Ashcroft filed a motion *in limine* to exclude the introduction of two email chains regarding an alleged lost opportunity with Chevron (the "Chevron emails"). In pertinent part, the Chevron emails originated when a non-WIKA employee named "Danny CD" sent a message to an employee of WIKA's sister company, Meliana Tanojo, stating that "[t]his is the email, I got from my customer Phenolic much better than POCAN." [*sic*] See PTX 222 [Dkt. 395], at p. 2. This email was then forwarded by Ms. Tanojo to a WIKA employee, Jeff Placek, and at some point a copy of the Product Information Page was attached. *See id.* Ashcroft moved to exclude this email

---

[11] *See* Trial Tr., Vol. X [Dkt. 408], at 30:8 – 30:18 ("[Y]'all are going to have a serious hearing with me as to what portions of this verdict to set aside and not because I am still extremely dissatisfied with the testimony of the fellow who talked about the crystal ball. And I'm very concerned that his testimony tainted this jury, and in spite of my instructions, they could not take that out of their mind.")

chain as inadmissible hearsay whose prejudice outweighed any probative value. *See* Dkt. 220.

The Court denied Ashcroft's motion *in limine* but required WIKA to make an evidentiary proffer outside the presence of the jury before attempting to introduce the Chevron emails. WIKA made this proffer through the testimony of Mr. Placek. *See* Trial Tr., Vol. IV (Placek) [Dkt. 400], at 7:1 – 34:21. Neither Danny CD nor Ms. Tanojo testified. Following WIKA's proffer, the Court overruled Ashcroft's objection and permitted the introduction of the Chevron emails (PTX 222 & 223) [Dkt. 395] for limited purposes, pursuant to the residual hearsay exception set forth in Fed. R. Evid. 807. *See id.* [Dkt. 400], at 57:18 – 58:21. Allowing the introduction of the Chevron emails was error, and that error was compounded when WIKA utilized the email chain for a speculative purpose.

1.  It was error to admit the Chevron emails pursuant to the residual hearsay exception.

"[O]ut-of-court statements are generally inadmissible because they are presumed to be unreliable. Given the presumption of unreliability, and because it is not a firmly rooted hearsay exception, the residual exception is to be used only rarely, in truly exceptional circumstances." *Rowland v. Rowland*, No. 1:04-CV-2068-TWT, 2005 WL 3096169, *3 (N.D. Ga. Nov. 18, 2005) (internal citations omitted). Specifically, any statement admitted pursuant to the residual exception

must: (1) have circumstantial guarantees of trustworthiness; (2) be offered as evidence of a material fact; (3) be more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts; *and* (4) admission of the statement must serve the purposes of the Rules and the interests of justice. *See* Fed. R. Evid. 807. WIKA fell far short of establishing these truly exceptional circumstances at trial.

There was no reason, let alone a compelling one, why WIKA could not have secured the testimony of Danny CD or Ms. Tanojo (either during discovery or at trial), to cure the hearsay problems posed by the Chevron emails. Personal knowledge was particularly important since the Chevron emails had no circumstantial guarantees of trustworthiness. To the contrary, the evidence established that Mr. Placek never spoke to either Danny CD or Ms. Tanojo about the Chevron emails, had no idea why Danny CD references an "email" not a "Product Information Page," acknowledged that Danny CD references a generic "customer" not Chevron, and admitted he never communicated with anyone at Chevron about the email chain **or** Product Information Page. *See* Trial Tr., Vol. IV (Placek) [Dkt. 400], at 36:21 – 37:10; 38:19 – 38:25; 40:1 – 40:8; 43:13 – 43:21; 48:16 – 48:22; 52:4 – 52:20. Incredibly, Mr. Placek attempted to explain why Danny CD wrote "customer" instead of "Chevron" because his grasp of English is poor, but he was

forced to admit he has no idea whether Danny CD's English is good or bad because the two have never spoken. *See id.*, at 40:5 – 40:16.

There was no direct testimony that the attachment to the Chevron emails was anything other than an "email" from some other "customer" of Danny CD and not, as WIKA argued, the Product Information Page supposedly received from Chevron. The Chevron emails lack the trustworthiness required by Federal Rule of Evidence 807, and this Court should grant a new trial because the jury was tainted by this improper introduction of hearsay evidence.

        2.      WIKA made improper use of the Chevron emails during closing.

Although it overruled Ashcroft's objection to the Chevron emails, this Court limited their use. This Court cautioned that:

> I can't make – believe that [the Chevron email] shows that Chevron didn't give WIKA the bid because they had the – I think that's very speculative to say that your damages of losing the Chevron bid is simply **because of that ad** but you can – I think the evidence shows that it's in circulation in Singapore within days of that bid or that bidding process in the relevant business community. And I suppose you could go to the next step that it may or may not have had some influence on Chevron, but to say this ad is the **reason** you lost the business? I mean, there are lots of reasons you're going to lose business besides a false ad.

Trial Tr., Vol. IV, at 58:7 – 58:21 [Dkt. 400] (emphasis supplied). Put differently, this Court warned WIKA against arguing that it lost the Chevron business "because of" the Product Information Page. But this is precisely what WIKA did.

31

Specifically, WIKA argued to the jury during closing that:

> WIKA's witnesses told you about the lost opportunity of the Chevron deal. WIKA heard about the Flame Ad within 18 hours of release from a source all the way on the other side of the world. Well, WIKA and Ashcroft were both bidding on the Chevron deal, and it had gotten to Chevron and all the way back to WIKA back in the U.S. that all of a sudden **Chevron was not interested** or it looked that way **because of the PI ad**. They were competing for a five-year contract with Chevron, and **WIKA lost this opportunity** … Can you imagine you push a button, and 18 or less hours later you've affected your competitor's ability to compete with you over a big deal with Chevron? Such is the power of a false ad that talks about safety characteristics.

Trial Tr., Vol. IX (WIKA closing), at 84:22 – 85:11 [Dkt. 416] (emphasis supplied).

Despite this Court's clear warning, WIKA drew a causal connection between the Product Information Page and the alleged lost opportunity with Chevron. It was error to introduce the Chevron emails into evidence, and WIKA's improper argument tainted the jury even further. This represents an additional reason why this Court should grant a new trial.

## V.   ASHCROFT IS ENTITLED TO A NEW TRIAL ON THE BASIS OF CERTAIN ERRONEOUS RULINGS THAT CREATED AN UNEVEN PLAYING FIELD AND RESULTED IN AN UNFAIR TRIAL.

At trial, the parties each accused the other of false advertising and advanced mirror-image claims under the Lanham Act, GUDTPA and CUTPA. Although the facts underlying each set of claims were different, the law applied to those facts should have been the same for both parties. But that was not what occurred.  Instead,

the parties' claims were treated differently through the following series of rulings that collectively created an uneven playing field and could have confused the jury into believing that a more lenient body of law applied to WIKA.

First, this Court erred by delivering two entirely different sets of jury instructions for what should have been mirror-image claims. Specifically, rather than creating a uniform set of jury instructions that synthesized the parties' respective proposals, this Court instead exclusively used instructions proposed by WIKA to instruct the jury on WIKA's claims and exclusively used instructions proposed by Ashcroft to instruct the jury on Ashcroft's counterclaims. During the charge conference, Ashcroft objected to this procedure because "the same law applies to all of the claims," and because the disparate treatment of the parties rendered the instructions non-neutral,[12] redundant and contradictory. *See* Trial Tr., Vol. IX (charge conferences) [Dkt. 416], at 19:1 – 19:21; 174:25-175:15. It was error to overrule Ashcroft's objection, and a new trial is warranted because the inconsistent instructions created an uneven playing field leading the jury mistakenly to believe

---

[12] This particular problem was exacerbated by the fact that WIKA's proposed jury instructions advocated for a particular result (i.e., for the jury to find in WIKA's favor), while Ashcroft's proposed instructions were drafted neutrally so that they could be applied to all of the claims in the case. *Compare* Dkt. 338 (Ashcroft instructions) *with* Dkt. 339 (WIKA instructions).

that two entirely different bodies of law applied to WIKA's claims versus Ashcroft's counterclaims.[13]

<u>Second</u>, it was error for this Court to preclude Ashcroft's expert, but not WIKA's expert, from testifying about subsequent flammability tests. During discovery, Ashcroft disclosed Dr. Joseph H. Koo as an expert who would be offered to testify about scientific tests that he performed to assess the reliability of Ashcroft's original flammability testing. Dr. Koo testified at a Daubert hearing, and this Court ruled that his proposed testimony was admissible pursuant to Federal Rule of Evidence 702. *See* Dkt. 183. Later, however, in response to a motion *in limine* filed by WIKA, this Court excluded Dr. Koo from testifying about those same tests on the ground that testing performed subsequent to the discontinuation of the Product Information Page would be irrelevant and confusing to the jury. *See* March 18, 2016 Pretrial Conf. Tr. [Dkt. 351], at 11:15 – 11:19; 16:19 – 17:25.

This ruling was error, because Dr. Koo's testing was relevant and admissible for the limited purpose of rebutting WIKA's argument that Ashcroft's original testing was unreliable. *See, e.g., Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1249 n.6 (11th Cir. 2002) (a Lanham Act plaintiff

---

[13]Ashcroft objected to WIKA instruction Nos. 10-15, 17-19, 21-26, 30-31, 33-37, supplemental charges 28-29 and the un-numbered charges after 27, 28 and 32. *See* Trial Tr., Vol. IX (charge conference) [Dkt. 416], at 174:25 – 175:19.

may "undermine the validity of the test results cited by the defendant by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior."). This error was compounded when WIKA's flammability expert, Dr. Barry Newton, was permitted to testify that **his** subsequent flammability testing showed that Ashcroft's initial "tests are wrong." *See* March 18, 2016 Pretrial Conf. Tr. [Dkt. 351], at 18:1 – 18:10; 19:12 – 19:20. As with the jury instructions, a new trial is warranted because these contradictory rulings put one party at a distinct disadvantage by permitting WIKA, but not Ashcroft, to compare Ashcroft's original testing to scientific tests performed by a flammability expert.[14]

Third, this Court's mistaken dismissal of Ashcroft's request for disgorgement of profits and enhanced remedies under the Lanham Act prejudiced Ashcroft by creating an apparent distinction between the relative worth of the parties' claims. In its July 10, 2015 summary judgment ruling, this Court held that Ashcroft abandoned those remedies by failing to oppose WIKA's request for entry of judgment as to them. *See* Dkt. 191, at p. 36. The Court denied Ashcroft's motion for reconsideration. *See* Dkt. Nos. 192 and 201. These rulings were erroneous. There was no basis for this Court to find abandonment because, as Ashcroft explained in

---

[14] WIKA exploited this advantage by playing a portion of the video of Dr. Newton's tests during the entirety of its rebuttal closing argument. *See* Trial Tr., Vol. IX (WIKA closing) [Dkt. 416], at 122:12 – 127:22.

its motion for reconsideration: (1) it responded substantively to WIKA's summary judgment arguments with respect to those remedies; (2) this Court ruled in Ashcroft's favor on the subsidiary findings necessary to support Ashcroft's demand for disgorgement and enhanced remedies; and (3) Ashcroft had no obligation to oppose those portions of a summary judgment motion seeking dismissal of a remedy. *See generally* Dkt. 192-1. Nor was this Court's ruling harmless. Indeed, WIKA was permitted at trial to argue entitlement to additional sources of damage (i.e., Ashcroft's profits and enhanced damages) while Ashcroft was not. A new trial is warranted because this ruling created an uneven playing field confusing the jury into believing erroneously that Ashcroft was more culpable than WIKA because one party, but not the other, was authorized to seek these additional remedies.

## VI.   ASHCROFT IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT IN FAVOR OF WIKA ON ASHCROFT'S TORTIOUS INTERFERENCE CLAIM.

There was sufficient evidence for the jury to be able to consider—and return a verdict on—Ashcroft's tortious interference counterclaim. The jury was deprived of the opportunity to do so because the Court erroneously granted summary judgment for WIKA on the basis that, as of the summary judgment stage, Ashcroft had only presented circumstantial evidence in support of its claim. *See* Order [Dkt. 191], at pp. 39-40 ("Ashcroft must present direct evidence and it has provided only

36

circumstantial evidence in support of this claim."). First, a plaintiff is not limited to direct evidence to support a Georgia tortious interference claim and certainly is not required to present direct evidence to survive summary judgment. Second, Ashcroft had direct evidence, which was presented during the trial but which the jury was not allowed to consider in connection with Ashcroft's tortious-interference claim.[15]

A.   Georgia does not require direct evidence of tortious interference.

To support the proposition that Georgia courts require direct evidence of tortious interference, the Court cited its *Trilink* decision. *See id.* at 39. The *Trilink* decision, in turn, cites three Georgia Court of Appeals opinions: (1) *American Southern Insurance Group, Inc. v. Goldstein*, 660 S.E.2d 810, 819-20 (Ga. Ct. App. 2008); (2) *Galardi v. Steele-Inman*, 597 S.E.2d 571, 577-78 (Ga. Ct. App. 2004); and (3) *Camp v. Eichelkraut*, 539 S.E.2d 588, 596 (Ga. Ct. App. 2000). *Id.*

---

[15] A party is not required to raise challenges to a *grant* of summary judgment via a Rule 50 motion. *See Owatonna Clinic—Mayo Health Sys. V. Med. Protective Co. of Fort Wayne, Ind.*, 639 F.3d 806, 810 (8th Cir. 2011) (rejecting argument that appellant waived right to appeal summary judgment order by not raising argument in a Rule 50 motion because "the issues raised here were not fully heard during a jury trial and so a Rule 50 motion was not necessary to preserve them") (internal quotation omitted). The minority of circuit opinions holding that legal issues decided on summary judgment must be raised in a post-trial motion appear all to have involved *denials* of summary judgment. However, to the extent that this Court considers the minority view applicable to challenges of a *granted* summary judgment, Ashcroft hereby preserves its rights under Rule 50 and requests consideration under Rule 50 and a new trial, under Rule 59, on Ashcroft's tortious-interference claim.

Importantly, **none** of them are summary judgment opinions. Rather, all three opinions are the result of post-jury-trial appeals in which the appellate court considered whether the trial court erred in granting or denying directed verdict or j.n.o.v. *after the plaintiff had presented its claim to the jury*. *See Am. Southern*, 660 S.E.2d at 819 (whether the court erred in granting directed verdict); *Galardi*, 597 S.E.2d 577 (whether the court erred in denying j.n.o.v.); *and Camp*, 539 S.E.2d at 596 (whether the court erred in denying directed verdict).[16] And none of these opinions expresses any such bright-line rule that a Georgia tortious interference claim cannot be supported with circumstantial evidence—they just hold that the claim may not be supported with evidence that is too speculative.

Other Georgia opinions demonstrate that circumstantial evidence *can* support a verdict on tortious interference. *See, e.g., Arford v. Blalock*, 199 Ga. App. 434, 441 (1991) ("the record contains sufficient circumstantial evidence to permit the jury to find Wilensky liable for tortious interference") and *Sowell v. Blackman*, 512 S.E.2d 713, 717 (Ga. Ct. App. 1999) ("This circumstantial evidence when combined with

---

[16] These opinions also suggest that any direct-evidence "requirement" may be limited to claims of tortious interference with *prospective* rather than current business relationships. Since the impact of particular conduct on a potential business relationship can be inherently more speculative than the impact on a current relationship, the higher hurdle for claims regarding prospective relationships makes sense. But Ashcroft claims, and the evidence showed, that WIKA interfered with Ashcroft's existing business relationships.

[] other conduct . . . is sufficient to create a jury issue as to . . . the claim of tortious interference with a contractual relationship.").

    B.    <u>The jury heard admissible, direct evidence of WIKA's tortious interference with Ashcroft's existing business relationships.</u>

Trial testimony at trial from WIKA's own witnesses only further solidified what the evidence presented at summary judgment already showed[17]: WIKA used its Durability Advertisements strategically to convince Ashcroft-distributor AWC to convert all of its end-users from Ashcroft to WIKA products, resulting in up to $1.2 million in increased revenue for WIKA.

Key WIKA employees testified that WIKA implemented a program specifically aimed at converting refineries and high-value distributors to use WIKA gauges *instead of* Ashcroft gauges. *See* Trial Trans., Vol V (Firestone) [Dkt. 414], at 46:1-4 and 47:11-21; Trial Trans., Vol VIII (Gerster) [Dkt. 415], at 162:5-9. A PowerPoint presentation detailing some aspects of the program even contained a slide entitled "Systematic Approach to Beating Ashcroft," which directed that the goal was to "attack first, defend second" and specifically identified the successful conversion of AWC as bringing WIKA $1 million "to date." *See* Trial Trans., Vol

---

[17] *See* Ashcroft Statement of Material Facts [Dkt. 100-2 ], at ¶ 193 and Additional Statement of Material Facts [Dkt 125], at  ¶¶ 223-228.

V (Firestone) [Dkt. 414], at 46:23 – 47:10; Trial Trans., Vol VIII (Gerster) [Dkt. 415], at 162:10-13. During the trial, WIKA employees further admitted that WIKA used its Durability Advertisements in connection with its strategic efforts to convert Ashcroft end-users and distributors such as Valin (Trial Trans., Vol V (Firestone) [Dkt. 414], at 48:16 – 50-4) and Valero (Trial Trans., Vol V (Firestone) [Dkt. 414], at 49:11-25) and that WIKA was successful in convincing AWC to drop Ashcroft and sell WIKA exclusively. *See* Trial Trans., Vol V (Firestone) [Dkt. 414], at 47:25 – 48:19; Trial Trans., Vol VIII (Gerster) [Dkt. 415], at 152:17-20. Indeed, the successful AWC conversion resulted in a net increase for WIKA of $700,000 to $1.2 million. *See* Trial Trans., Vol V (Firestone) [Dkt. 414], at 48:13-15.

Even assuming, *arguendo*, that the testimony and trial exhibits amounted only to circumstantial evidence, the Court should not have precluded the jury from weighing the evidence and deciding the merits of Ashcroft's tortious-interference claim. Ashcroft was deprived of the chance to have a jury decide its claim and, based on the sufficiency of the evidence presented (by WIKA's own witnesses), a reasonable jury could have found for Ashcroft.[18]

---

[18] The error was particularly unfair and harmful to Ashcroft since the Court allowed WIKA to proceed to trial on its tortious-interference claim even though WIKA's claim was supported by much more tenuous, triple-hearsay evidence. *See*, *supra*, at Section IV. B.

## VII.   ASHCROFT IS ENTITLED TO A NEW TRIAL ON ITS LANHAM ACT COUNTERCLAIM BECAUSE THE JURY'S FINDINGS WERE AGAINST THE WEIGHT OF THE EVIDENCE.

### A.   The Jury's Finding Of No Literal Falsity Is Against The Weight Of The Evidence.

In connection with Ashcroft's Lanham Act counterclaim against WIKA, the jury found that WIKA's Durability Advertisements were misleading but not literally false. *See* Verdict [Dkt. 388], at Question Nos. 27 & 29. Ashcroft is entitled to a new trial because this finding is against the weight of the evidence. *See, e.g., McGinnis*, 817 F.3d at 1254 (losing party may move for new trial under Rule 59 if "verdict is against the weight of the evidence").

In order to meet its burden of proving literal falsity, Ashcroft was only required to establish that the tests offered by WIKA in support of its Durability Advertisements "did not establish the proposition for which they are cited." *See Osmose*, 612 F.3d at 1309. During its closing argument, WIKA admitted that this element was satisfied by acknowledging pervasive "mistakes" in its testing. In particular, counsel admitted that:

> WIKA has made some mistakes. Yes, 4.46 times longer is slightly different than five times longer. It's a mistake. Yes, testing the leading brand, the 1279 gauge, is not the same as testing leading brands. And, yes, the ten million cycles claim did not specifically test accuracy, although it gave positive results with respect to the WIKA gauge. But we believe you will see and will conclude from the attitude and the

41

testimony of WIKA witnesses that WIKA acknowledges that when it
makes a mistake and it tries to correct it and move on.

*See* Trial Tr., Vol. IX (WIKA closing) [Dkt. 416], at 88:20 – 89:4. Neither the

"attitude" of WIKA's witnesses nor their mea culpas erase the fact that these

"mistakes" mean that WIKA's tests could not and did not establish the proposition

for which they were cited. Nothing more is required to prove literal falsity.

Perhaps unsurprisingly, this Court also independently came to the same

conclusion in its post-trial findings of fact. Specifically, based on its own evaluation

of the evidence, this Court found:

> Beginning with the announcement of the XSEL gauge in 2012 and
> continuing through 2013, WIKA published and distributed
> advertisements claiming that the XSEL lasted "5 times longer than
> competing brands in like applications" and could withstand "10 million
> pressure cycles without compromise to accuracy." WIKA **did not have
> test data** to support those claims: it **admittedly did not test**
> "competing brands," but rather only the 1279, **did not have test data**
> reflecting the "5 times longer" claims, and admitted concern that it
> could not "legally" make these marketing claims **without full test
> reports**. WIKA **did not test** the accuracy of the XSEL gauge at 10
> million pressure cycles and **acknowledges that the claim is false** and
> should not have been published. WIKA claimed that the XSEL, when
> combined with its "All Welded System," lasted "2.5 times longer."
> However, WIKA **did not test** or measure the durability of the XSEL
> combined with the All Welded System and **never saw testing data** to
> support that claim.

*See* July 22, 2016 Order [Dkt. 426], at p. 20 (emphasis supplied). This Court's

findings, therefore, contradict the jury's verdict. This Court concluded that WIKA

42

tests did not support its Durability Advertisements, and, worse, it **knew** the advertisements were false and unsupported. The jury's conclusion that the Durability Advertisements were not literally false cannot stand in light of these findings because it is against the weight of the evidence. Ashcroft is therefore entitled to a new trial.[19]

### B.   The Jury's Finding Of No Materiality Is Against The Weight Of The Evidence.

To the extent that the jury found that WIKA's Durability Advertisements did not have a material effect on consumers' purchasing decisions (*see* Verdict [Dkt. 388], at Question No. 30[20]), that finding also is against the weight of the evidence and entitles Ashcroft to a new trial.

It is well-established in the Eleventh Circuit that "[a] plaintiff may demonstrate [materiality] by showing that the defendants misrepresented an inherent quality or characteristic of the product." *See Osmose, Inc.*, 612 F.3d at 1319. Here,

---

[19] The jury verdict cannot be saved by virtue of its findings regarding deception and injury. If the jury had followed the evidence and found literal falsity, those elements would be presumptively satisfied. *See, e.g., Osmose, Inc.*, 612 F.3d at 1308; *Trilink*, 583 F. Supp. 2d at 1321.

[20] Question No. 30 of the jury verdict form asked the jury to answer whether the Durability Advertisements: (1) deceived customers; (2) had a material effect on consumers' purchasing decisions; AND (3) caused Ashcroft injury. *See* Verdict [Dkt. 388], at Question No. 30. Because this question was phrased in a conjunctive manner, it is unclear whether the jury's negative response related to the materiality requirement or some other element.

Ashcroft easily met its burden of showing materiality because WIKA's advertisements related directly to durability, which this Court has recognized as a key factor in consumers' purchasing decisions within this industry. *See* July 22, 2016 Order [Dkt. 426], at p. 8 ("A gauge's **durability**, flammability, and fire safety characteristics are important factors in the refinery industry consumer's purchasing decision when considering pressure gauges.") (emphasis supplied); *see also Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.*, 284 F.3d 302, 312 (1st Cir. 2002) (inherent characteristic is one that "defines the product at issue"). Accordingly, if the jury did find no materiality, that finding is against the weight of the evidence and is an additional ground to grant a new trial.

## CONCLUSION

For the foregoing reasons, Ashcroft requests that the Court grant its motion for judgment as a matter of law on WIKA's claims, or, in the alternative, that it order a new trial and/or remittitur as outlined above.

Respectfully submitted this 19th day of August, 2016.

HOLLAND & KNIGHT LLP

*/s/ Caroline J. Tanner*
Caroline J. Tanner (GA Bar No. 392580)

*Attorney for Ashcroft, Inc.*

# <u>CERTIFICATION OF COUNSEL</u>

Pursuant to Local Rule 7.1D, the undersigned counsel for Defendant files this Certification of Counsel stating that the foregoing document was prepared in Times New Roman, 14 point font, in accordance with Local Rule 5.1B.

HOLLAND & KNIGHT LLP

*/s/ Caroline J. Tanner*
Caroline J. Tanner (GA Bar No. 392580)

*Attorney for Ashcroft, Inc.*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 19th day of August, 2016.

HOLLAND & KNIGHT LLP

*/s/ Caroline J. Tanner*
Caroline J. Tanner (GA Bar No. 392580)

*Attorney for Ashcroft, Inc.*

46